Index No.  CV 07 4019 (RPP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARELL BUSH,

Plaintiff,

- against -

THE CITY OF NEW YORK , *et al.*

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Deborah Dorfman*
*Tel:  (212) 788-0408*
*NYCLIS No. 2007-020650*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………1

STATEMENT OF FACTS ……………………………………………………………. 2

ARUGMENT………………………………………………………………………....2

POINT I: STANDARDS FOR DISMISSAL UNDER FED.
R. 12(b)(6) AND 12(b)(1)……………………………………………………………2

POINT II: …PLAINTIFF IS BARRED FROM RECEIVING COMPENSATORY DAMAGES
BY THE PRISON REFORM LITIGATION
ACT……………………………………………………………………………….........3

POINT III: PLAINTIFF  FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED………………….....………………………………………………………4

      A.     Alleged Unconstitutional Conditions of Confinement…………………………...5

           1.     The Deprivation Must Be "Sufficiently Serious"…………………5

           2.     Plaintiff Must Also Allege  Facts Sufficient To Show
                     That Defendants Acted With A Culpable State of Mind…………6

           3.     Overcrowding………………………………………………………7

           4.     Inadequate Bed Space & Lack of Privacy…………………………8

           5.      Personal Items…………………………………………………....11

           6.     Laundry Services………………………………………….......13

           7.     Exercise, Recreation,  Indoor Gymnasium, Law Library & Sick
                     Call………………………………………………………………13

                 a.     Exercise, Recreation, & Access to the Indoor
                        Gymnasium…………………………………………14

                 b.     Law Library…………………………………………...16

                 c.     Sick call……………………………………………….17

**Page**

8.    Staffing and Off-Housing Unit Activities............................17

        a.    Law Library.................................................17

        b.    Social Services & Muslim Services.........................17

9.    Exposure to Communicable Disease................................19

10.    Unsanitary Conditions.................................................21

B.    Plaintiff Has Failed to Allege A Viable *Monell* Claim..............................22

POINT IV: CLAIMS AGAINST DEFENDANTS HORN, LANGSTON, AND DAVIS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NOT ALLEGED THEIR PERSONAL INVOLVEMENT IN THE INCIDENTS ALLEGED IN THE COMPLAINT .................................................................................................. 22

POINT V: PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING .................................................................................................24

CONCLUSION....................................................................................25

**APPENDICES:**

Appendix I: Complaint

Appendix II: The City of New York Board of Correction Minimum Standards for New York City Correctional Facilities, §§ 1-05, 1-07, 1-08, 1-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

DARRELL BUSH,

                                                  **07 CV 4019 (RPP)**

                               Plaintiff,

              -against-

NEW YORK CITY DEPARTMENT OF CORRECTIONS,
*et al.*,

                                  Defendants.

------------------------------------------------------------------------ x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

### PRELIMINARY STATEMENT

        Plaintiff, a sentenced inmate, filed this lawsuit in May of 2007, alleging inadequate conditions of confinement while incarcerated at the Eric M. Taylor Center ("EMTC") on Riker's Island. These allegations included: overcrowding which allegedly led to inadequate access to personal supplies, laundry services, and exercise, among other complaints. Defendants now respectfully move this Court to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12 (b)(1) on the grounds that: 1) plaintiff is barred from obtaining compensatory damages by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(e) because he has failed to allege any actual physical injury; 2) plaintiff has failed to state a claim upon which relief can be granted as he has failed to allege facts sufficient to state constitutional violations as to his conditions of confinement; 3) because plaintiff has failed to allege claims sufficient to rise to the level of a constitutional violation, he cannot prove a *Monell* claim against defendant NYC; 4) plaintiff has failed to allege sufficient facts that the named defendants had personal involvement in the incidents and occurrences alleged in the Amended Complaint to establish

liability for damages under §1983; and 5) this Court lacks subject matter jurisdiction over claims for which plaintiff lacks standing.

## STATEMENT OF FACTS

Plaintiff alleges numerous problems with conditions while he was incarcerated at EMTC on Riker's Island as a convicted prisoner. *See generally* Amended Complaint, attached hereto as Appendix I. Specifically, plaintiff alleges that the EMTC at Riker's Island is overcrowded and as a result there was: inadequate sleeping space and lack of privacy when sleeping & bathing; insufficient personal "supplies"; insufficient laundry services; denial of opportunity for exercise, recreation, and to go to the law library; understaffing & inability to attend activities off of plaintiff's housing unit; unavailability or discontinuation of certain activities; exposure to communicable diseases; and unsanitary living conditions; *See id*. Plaintiff seeks compensatory damages and an award of attorneys' fees and costs. Amended Complaint, at p. 12. Plaintiff is no longer at Riker's Island. *See id* at ¶ 5.

## ARGUMENT

### POINT I

### STANDARDS FOR DISMISSAL UNDER FED. R. CIV. P. 12(B)(6) AND 12(B)(1)

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the allegations in the complaint are accepted as true. *Grandon v. Merrill Lynch*, 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

The standards for determining a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) are "substantively identical" to those under 12(b)(6), except that for the purposes of a 12(b)(1) motion, it is the party "invoking the jurisdiction off the court" that has the burden of proof. *Lerner v. Fleet Bank, N.A.*, 318 F. 3d 113, 128 (2nd Cir.), *cert. denied* 540 U.S. 1012, 124 S. Ct. 532, 157 L. Ed. 2d 424 (2003). Additionally, unlike a 12(b)(6) motion[1], the court can consider additional papers and affidavits submitted by the moving party in support of the motion. *De Yu Zhang v. U.S. Citizenship and Immigration Service*, 2005 U.S. Dist. LEXIS 26805, *13 (S.D.N.Y. 2005). For the reasons stated below, the Amended Complaint should be dismissed in its entirety.

## POINT II

### PLAINTIFF IS BARRED FROM RECEIVING COMPENSATORY DAMAGES BY THE PRISON REFORM LITIGATION ACT

The Amended Complaint should be dismissed pursuant to the Prison Reform Litigation Act ("PLRA"), 42 U.S.C. § 1997e(e) because plaintiff has failed to allege any physical injuries. *See* Amended Complaint. Section 1997e(e) of the PLRA, in relevant part, states that "No Federal civil action may be brought by a prisoner confined in jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Courts in this District and in the Second Circuit had repeatedly held that where a prisoner, as defined under the PLRA, has failed to allege any physical injury, his or her claims for compensatory damages must be dismissed. *See Jenkins v. Haubert*, 179 F. 3d 19, 28-29 (2d Cir. 1999); *Voorhees v. Goord*, 2006 U.S. Dist. LEXIS 48370 (S.D.N.Y. Feb. 24, 2006)(compensatory damages claims dismissed where inmate alleging

---

[1] Except that in a 12(b)(6) motion a court may consider documents for which it can take judicial notice. *Chambers v. Time Warner*, 282 F. 3d 147, 153 (2nd Cir. 2002).

custodial assault and threats by a correction officer failed to allege actual physical injury); *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 553 (E.D.N.Y. 2004)(defendants' motion to dismiss where prisoner plaintiff failed to allege any physical harm.). This restriction on the recovery of compensatory damages under the PLRA is equally applicable to former prisoners. *Lipton v. County of Orange, New York, et al.*, 315 F. Supp. 2d 434, 456-57 (S.D.N.Y. 2004) *citing Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002), *aff'd* 56 Fed. Appx. 43 (2d Cir. 2003)("The fortuity of release on parole does not affect the kind of damages that must be alleged in order to survive the gate-keeping function of section 1997e(e). Because plaintiff's suit alleges only emotional injuries, it is barred by the PLRA irrespective of his status as a parolee at the time of filling.").

In the instant matter, plaintiff has not alleged any physical harm resulting from the conditions about which he complains. *See generally*, Amended Complaint. Rather, the only harm that plaintiff alleges is that defendants actions or inactions have caused him "genuine deprivation and hardship" (Amended Complaint at ¶ 23) and have caused him to be placed "at risk" of "increased violence, illness, mental suffering, and deteriorating health." *Id.*, ¶¶ 35 and 41. Such allegations are not sufficient to meet the requirements of an actual physical injury as required by the PLRA. Thus, plaintiff's claims for compensatory damages are barred by the PLRA and must be dismissed.

## POINT III

### PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

In spite of notice pleading requirements under Fed. R. Civ. P. 8, "a civil rights complaint 'must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are

insufficient to state a claim under §1983." *Williams v. City of New York,* 2005 U.S. Dist. LEXIS 26143, at *8-9 *quoting Vishevnik v. Supreme Court,* 1999 U.S. Dist. LEXIS 15516 (S.D.N.Y. Oct. 6, 1999). Here, as discussed below, plaintiff has failed to establish a claim under § 1983.

### A.  Alleged Constitutional Violations for Conditions of Confinement

The constitutional claims regarding a convicted prisoner's conditions of confinement are analyzed under the Eight Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Hathaway v. Coughlin*, 37 F.3d 63 , 66 (2d Cir. 1994), *cert denied*, 513 U.S. 1154 (1995). The Supreme Court has determined this to include punishments that "involve the unnecessary and wanton infliction of pain." *Id. citing Gregg v. Georgia,* 428 U.S. 153, 173 (1976).  While the Constitution prohibits inhumane conditions for prisoners, it 'does not mandate comfortable prisons.' *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) *quoting Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

### 1.  The Deprivation Must Be "Sufficiently Serious"

In order for a prisoner to establish constitutional violations relating to conditions of confinement, he must meet a two prong test.  First, the plaintiff must show that the deprivation is "sufficiently serious" or there exists a "substantial risk of serious harm" to the prisoner. *Farmer*, 511 U.S. at 834. A prisoner's uncomfortable living conditions are insufficient to establish a constitutional violation. *Jones* v. *Goord*, 435 F. Supp. 2d 221, 234-35 (S.D.N.Y. 2006) *quoting Wilson v. Seiter, et al.*, 501 U.S. 294, 298 (1991).  Rather, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of "the minimal civilized measure of life's necessities". *Rhodes*, 452 U.S. at 347.

### 2.  Plaintiff Must Also Show That Defendants Acted With a Culpable State of Mind

The second prong of the deliberate indifference test requires the plaintiff to show that the defendant has acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 *citing Wilson*, 501 U.S. at 297. What constitutes a "culpable state of mind" under this prong of the constitutional analysis is dependent upon what harm is alleged. *Jones*, 435 F. Supp. 2d at 235. In matters involving conditions of confinement, the "deliberate indifference" standard is applicable. *Id. citing Wilson*, 501 U.S. at 303; *see also Hathaway v. Coughlin*, 99 F. 3d 550, 553 (2d Cir. 1996)(inmate must show that prison officials acted with "a sufficiently culpable state of mind"). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety, the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Chance v. Armstrong*, 143 F. 3d 698, 701 (2d Cir. 1998) *quoting Farmer*, 511 U.S. at 837). In matters involving conditions of confinement, the deliberate indifference standard is applicable. *Chance*, 143 F. 3d at 701 *citing Wilson*, 501 U.S. at 303; *see also Hathaway*, 99 F. 3d at 53.

In order to properly allege that a defendant in §1983 action violated an inmate's constitutional rights, the plaintiff must allege that the defendant was specifically aware of the inmate's particular conditions of confinement and that such specific conditions posed "an excessive risk" to the inmate's health and safety and that the defendant disregarded that excessive risk. *Flynn v. Wright, et al.*, 2007 U.S. Dist. LEXIS 69422, * (March 23, 2007) *citing Williams v. Fisher*, 2003 U.S. Dist. LEXIS 16442, 2003 WL 22170610, at *9 (S.D.N.Y. Sept. 18, 2003) (failure to allege knowledge of a specific condition placing the plaintiff at excessive risk to his or her health and safety insufficient to state a claim for deliberate indifference). Reliance on an official's alleged knowledge of general prison conditions does not satisfy the deliberate

indifference pleading requirement as a plaintiff must allege facts that the defendant was aware of a specific risk or condition that would constitute an excessive risk to the inmate's health and safety and disregard that risk. *Melo v. Combes*, 1998 U.S. Dist. LEXIS 1793, 1998 WL 67667, at * 14 (S.D.N.Y. 1998).

Here, plaintiff alleges that his rights were violated under both the Eighth and Fourteenth Amendments to the United States Constitution. Amended Complaint at ¶¶ 34-45. Since, however, he was a convicted prisoner at the time he alleges his claims arose, his claims must be analyzed under the Eighth Amendment and not the Fourteenth Amendment. *Helling*, 509 U.S. at 31. Thus, any claims that plaintiff has for violations of his Fourteenth Amendment rights in this matter must be dismissed as a matter of law. Furthermore, as discussed below, plaintiff has failed to state claims under the Eighth Amendment for the alleged inadequate conditions of his confinement and these claims must be dismissed.

### 3.     Overcrowding

The overall theme of the Complaint is that as a result of overcrowding, plaintiff was subjected to substandard living conditions and denied various services and opportunities to which he asserts he was entitled. *See generally,* Amended Complaint.

Overcrowding and inadequate conditions of confinement resulting from overcrowding, as alleged by plaintiff are "properly the subject of an Eighth Amendment claim only if the plaintiff can show that overcrowding caused the infliction of cruel and unusual punishment against him personally." *Coronado v. Goord, et al.*, 2000 U.S. Dist. LEXIS 13876, * 18 (Sept. 26, 2000) *citing Rhodes*, 452 U.S. at 348. "It is a rare case when a plaintiff can make out a claim that his injuries were caused by overcrowding." *Id.* at * 19-20 (citations omitted). Just because a jail is overcrowded and an inmate suffers an injury or is placed at risk of injury does not mean that the risk is a result of overcrowding. *Rhodes*, 452 U.S. at 348, 18 U.S.C. §

3632(a)(1) ("A Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff proves that crowding caused the infliction of cruel and unusual punishment of that inmate.").

Here, set forth more fully below in Sections 4 through 10, plaintiff makes numerous conclusory allegations that the overcrowding led to unconstitutional conditions of confinement by pointing to a laundry list of unpleasant conditions to which the plaintiff was allegedly subjected. These conditions, however unpleasant and undesirable, even when viewed in the "totality of the circumstances," do not violate the Constitution. Furthermore, plaintiff has failed to allege facts sufficient to show that the individually named defendants acted with deliberate indifference to his health and safety.

### 4.    Inadequate Bed Space and Lack of Privacy

Plaintiff alleges that as a result of overcrowding at the EMTC, he was denied sufficient bed space and forced to sleep and bathe without privacy. Amended Complaint at ¶ 14. There is no constitutional right to a particular amount of bed space. *See Benjamin, et al . Fraser. et al.* (*Benjamin II*), 343 F. 3d 35, 53 (2d Cir. 2003). In *Benjamin II*, the Second Circuit explicitly rejected the District Court's finding that at inmates at Riker's Island must be afforded at least 6 feet of sleeping space at each inmate's head to meet constitutional requirements. *Benjamin, et al . Fraser. et al.*, 343 F. 3d 35, 53 (2d Cir. 2003). The Court, in relevant part, held that "there is no constitutional requirement that pretrial detainees[2] have six feet of breathing room". The Court also stated that in order to establish a constitutional violation resulting from

---

[2] Since pretrial detainees are to be given at least the same rights as convicted prisoners, convicted prisoners, such as plaintiff, does not have any additional rights in this regard, and in fact may have less than pretrial detainees.

inmates sleeping too closely to one and other, the inmates would have to demonstrate an actual or imminent risk of substantial harm". *Id. citing Lewis v. Casey*, 518 U.S. 343, 350 (1996).

Here, plaintiff has merely alleged that he was housed in a dorm that was designed to house 48 men but housed 60 men while was at the EMTC. Amended Complaint, ¶ 14. He further alleged that: the inmates in his dorm slept and bathed without privacy; that due to overcrowding, plaintiff had to sleep in conditions where his bed touched his locker; there was only one foot of space between him and another inmate; and that these conditions violated §1-05 of the City's Minimum Standards *Id*. Plaintiff, however, has not alleged that as a result of these conditions he suffered an actual substantial harm. Further, plaintiff is no longer incarcerated at the EMTC and thus, cannot show that he is "at imminent risk" of any injury as a result of these conditions. Thus, he cannot meet the first prong of the deliberate indifference standard required in *Benjamin* to establish a constitutional violation for inadequate bed space. *See Benjamin*, 343 F. 3d at 53.

Plaintiff has also failed to allege sufficient facts that defendants acted with a "sufficiently culpable state of mind." First, as discussed above, plaintiff cannot show he has suffered or is at risk of suffering a sufficiently serious harm as a result of the alleged inadequate sleeping space, he therefore, cannot show that defendants were deliberately indifferent to an "excessive risk" to plaintiff's health and safety.

Moreover, plaintiff's allegations that defendants acted with deliberate indifference in regards to the amount of sleeping space that he was afforded are merely conclusory and lack the specificity of pleading required, even in light of notice pleading rules under Fed. Civ. P. 8, to establish a claim for the second prong of an Eighth Amendment claim. *See* Discussion at Point III.A.2 at p. 7. Specifically, plaintiffs alleges no specific facts

establishing that the individually named defendants were involved in or aware of the alleged conditions, that they were aware of an excessive risk to his health and safety and that they disregarded this risk. Rather, plaintiff, in relevant part, makes only conclusory allegations against the individually named defendants. *See* Amended Complaint, ¶¶35, 36, and 38, respectively. None of these allegations or any of the other allegations in the Amended Complaint identify facts to establish that any of the individual defendants were aware of plaintiff's specific conditions of care, that such conditions posed an "excessive risk" of harm to his health and safety, and that they disregarded this excessive risk.

Finally, as discussed above, under Point II, plaintiff has also failed to allege that he suffered a physical injury as a result of inadequate bed space and lack of privacy. *See id.* Consequently, he has failed to state a constitutional claim for which relief can be granted for his claims about inadequate bed space and denial of privacy while sleeping and bathing and thus, this claim must be dismissed.

### Section 1-05 of the City of New York Board of Correction Minimum Standards for New York City Correctional Facilities

Plaintiff also alleges that lack of privacy in his sleeping area and the inadequate bed space violated the § 1-05 of the City of New York Board of Correction Minimum Standards for New York City Correctional Facilities ("Minimum Standards"), attached hereto as Appendix II.[3] Specifically, plaintiff alleges that the housing unit at which he was housed was designed for only 48 men yet it housed 60 men in violation of § 1-05 of the Minimum Standards. Amended Complaint at ¶ 14. These standards, however, state in relevant part that " a multi-occupancy area shall house no more than: (i) 50 Detainees; (ii) 60 Sentenced Prisoners…" §1-05 Minimum

---

[3] Defendants respectfully request that the Court take judicial notice of the DOC Minimum Standards given that plaintiff has specifically incorporated them by reference into his Complaint. Chambers, 282 F. 3d at 153.

Standards. Thus, even if plaintiff's living area housed 60 inmates, this number does not violate the Minimum Standards as plaintiff was a sentenced inmate and the standards permit housing 60 sentenced inmates in a multi-occupancy area such as the one in which plaintiff was housed.

Even if, however, these conditions violated § 1-05 of the Minimum Standards, these standards are not enforceable in federal court. *See Handberry v. Thompson*, 446 F. 3d 335, 344-46 (2d Cir. 2006)(The PLRA limits federal court relief to federal claims).   Furthermore, a violation of these Standards is no *per se* a constitutional violation, as a plaintiffs must  show that the violation of these standards meets the two prong deliberate indifference test described above to constitute a constitutional violation.

### 5.    Personal Items

"Temporary deprivations of toiletries do not violate the Constitution. *See Trammell v. Keane*, 338 F. 3d 155, 165 (2d Cir. 2003)(deprivation of "toiletries for approximately two weeks––while perhaps uncomfortable—does not pose such an obvious risk to inmate's health and safety that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they drew] the inference.'" *quoting Farmer*, 511 U.S. at 837.

Here, plaintiff alleges that while housed in "Upper 11" of the EMTC "there were regular, ongoing deprivations of basic health and hygiene supplies, such as, but not limited to, soap, detergent, toothpaste, razors, toilet papers, and blankets because there were inadequate quantities to supplies the inmates being housed therein." Amended Complaint at ¶ 15.  Plaintiff further alleges that the denial of these supplies "directly led to increased stress levels, physical discomfort, medical risks, and acts of aggression." *Id.*   Plaintiff does not allege that *he* was denied any of the supplies that he needed. Rather, he makes only a general conclusory allegation

that there were insufficient supplies for the inmates on Upper 11 because there were only enough supplies for 50 inmates rather than for the 60 inmates on his housing unit.

Even if the Court were to construe the Amended Complaint to allege that plaintiff was denied these supplies, the fact that plaintiff had to go without some personal supplies on some occasions does not rise to the level of a constitutional violations as he has not established that he suffered an actual injury that was sufficiently serious as is required to allege a constitutional violation in prison or jail conditions context.

Moreover, although plaintiff alleged that the denial of these supplies "directly led to increased stress levels, physical discomfort, medical risks, and acts of aggression", such allegations are inadequate to state a claim upon which relief can be granted. It is well established that mere discomfort and stress does not constitute a "sufficiently serious" harm or risk of harm to establish a constitutional violation. *Farmer*, 511 U.S. at 853 *citing Rhodes*, 452 U.S. at 349. Plaintiff's claims that there were "medical risks and acts of aggression" also fail to establish a "sufficiently serious harm" as plaintiff has not alleged that he specifically suffered a particular medical risk that was "sufficiently serious" to pose an unreasonable risk of serious damage to the plaintiff's future health and safety due to not getting the supplies that he needed. Finally, plaintiff has not alleged that he suffered any actual injury as a result of "increased ...acts of aggression" and he is not at risk of harm since he is no longer at the EMTC.

Plaintiff, has also failed to allege facts sufficient to establish that defendants acted with deliberate indifference in depriving him of personal hygiene supplies. Although plaintiff alleges that he complained to Deputy Warden Larza and wrote letters to Warden Langston and the Central Office of the DOC about the Environmental Housing Officer, Captain Rughbart, the officer in charge of distributing the supplies and about the lack of supplies and nothing was done

-12-

about the situation (Amended Complaint,¶ 16), such allegations are insufficient to personal involvement to establish a culpable state of mind on the part of the defendants. *See Islam v. Fischer*, 2008 U.S. Dist. LEXIS 1464 *Jan. 9, 2008), at * 6. These claims should, therefore, be dismissed.

### 6.    Laundry Services

Courts in this jurisdiction have held that there is no constitutional violation where "inmates are provided the opportunity and the supplies to wash their clothes." *Lunney v. Brureton*, 2007 U.S. Dist. LEXIS 38660* (S.D.N.Y. May 25, 2007). Here, plaintiff does not allege that he has was unable to wash his clothes. Instead, he alleges that laundry services were "insufficient to provide each inmate in EMTC with a clean change of clothing at least twice per week, and clean towels and bed linens once a week, in accordance with § 1-04 of the Minimum Standards. As discussed above in 2.c, a violation of the Minimum Standards does not necessarily constitute a constitutional violation and is not enforceable in federal court. A plaintiff must meet the two prong test of the deliberate indifference standards described above to make a claim for a constitutional violation in regards to his allegations that the laundry service was not adequate. Plaintiff has not alleged facts sufficient to meet these requirements.

Plaintiff has not adequately plead such facts to meet the objective "sufficiently serious" prong of the test. Plaintiff also does not allege any actual "sufficiently serious" injury resulting from insufficient laundry service and he is not at risk of any "sufficiently serious" injury because he is no longer at the EMTC. Additionally, plaintiff has not adequately alleged facts that defendants acted with a culpable state of mind in regard to this claim. *See* Discussion at Point III.A.2 at p. 7. Plaintiff's claim must therefore, be dismissed.

### 7.    Exercise, Recreation, Indoor Gymnasium, Law Library, and Sick Call

Plaintiff alleges that due to overcrowding and understaffing he was denied opportunities for exercise, recreation, and to go to the law library in violation of §§ 1-07 and 1-09 of the Minimums Standards. Amended Complaint, ¶18. He also alleges that as a result of overcrowding some activities have been "diminished' or have become "unavailable". *Id.*, ¶ 20. For these reasons discussed below, plaintiff's claims should be dismissed.

### a.    Exercise, Recreation & Access to the Indoor Gymnasium

Inmates have a right to some opportunity for exercise *Anderson v. Coughlin*, III, 757 F. 2d 33, 35 (2nd Cir. 1985), but do not have a constitutional right to recreation. *Beckford v. Protuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) *citing French v. Owens*, 777 F. 2d 1250, 1255 (7th Cir. 1985) ("it is not the right to recreation, but, rather, the right to exercise that the Eight Amendment protects."). In examining whether an inmate's constitutional rights have been violated, a review of the inmate's "availability of exercise is a key ingredient of a court's analysis." *Williams v. Greifinger*, 97 F. 3d 699, 704 (2d Cir. 1996). Denials of access to indoor recreation during inclement weather do not necessarily violate the constitution. *Anderson*, 757 F. 2d at 36; *Gibson v. City of New York*, 1998 U.S. Dist. LEXIS 3618, *10 (S.D.N.Y. 1998)(brief periods of deprivation of exercise due to bad weather not a constitutional violation).

Here, plaintiff's allegations, do not satisfy either prong of the deliberate indifference test to state a constitutional claim. *See Anderson*, 757 F. 2d at 35. First, since there is no constitutional right to recreation, plaintiff's claim in regards to opportunities for recreation must be dismissed.

Plaintiff's allegation that he was not allowed to go to the gym and that inmates were not provided warm, water resistant clothing or footwear to wear in the yard (Amended Complaint, ¶ 20) are also insufficient to state a constitutional claim because plaintiff has failed to

allege facts sufficient to demonstrate such conditions were sufficiently serious to cause him to suffer or be placed at risk of serious harm to his health and safety, particularly given the temporary nature of these alleged deprivations. Plaintiff's incarceration at EMTC was only 7 and ½ months. *Id.*, ¶ 5. The winter months during this period were only a portion of that time. At best, any deprivation of exercise due to the inability to go outside was temporary during periodic inclement weather and plaintiff has not alleged that he was denied the opportunity to go outside or that the weather was inclement for the entire period of his incarceration. Temporary deprivations of the ability of an inmate to go outside during inclement weather are not violate the constitution. *Anderson*, 757 F. 2d at 35; *Gibson*, 1998 U.S. Dist. LEXIS 3618, at *10. Plaintiff has also alleged no physical injury as a result of this alleged deprivation. He is also not at risk of such harm since he is no longer at the EMTC.

Plaintiff's claim that he was unable to have opportunities for exercise because such opportunities conflicted with other activities is also not sufficient to state a constitutional claim. Plaintiff has not alleged facts sufficient to state a claim that this deprivation was sufficiently serious and that as a result, plaintiff was deprived "the minimal civilized measure of life's necessities or that suffered harm or a risk of harm to his health and safety.

Plaintiff also has not alleged facts sufficient to demonstrate that defendants acted with a culpable state of mind in regards to this alleged denial. *See* Discussion at Point III.A.2 at p. 7. He has not alleged any facts indicating that defendants were aware of plaintiff's access to exercise, that consequently there was a excessive risk of harm to plaintiff's health and safety, and that they disregarded that specific serious harm or risk of harm.

Finally, nothing in the Minimum Standards prohibits more than one activity from being scheduled at the same time. *See* Minimum Standards, attached hereto as Appendix II. Even

if the Minimum Standards, however, did have such a prohibition, such a violation would not necessarily violate the constitution as a violation of these standards does not alone rise to the level of a constitutional claim. To show a constitutional violation, a plaintiff must meet the two prong deliberate indifference test described above in this Section, which for the reasons discussed herein, plaintiff has failed to do. Moreover, compliance with the Minimum Standards is not enforceable in federal court. *See* Discussion at §4, above at pp. 10-11..

        **b.**    **Law Library**

Inmates have a constitutional right to reasonable and meaningful access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821, 824-25 (1977). In order to properly allege a claim for a violation of the right to access to the courts, which includes access to a law library, a plaintiff must show: 1) deliberate indifference by jail personnel to this right; and 2) an actionable claim causing injury. *Stanislas v. Tolson*, 2002 U.S. Dist. LEXIS 10733, * 4-5 (E.D.N.Y. March 19, 2002). Specifically, an inmate must allege that he or she was prevented from pursuing a legal action as a result of inadequate access to the law library and/or the courts. *Lewis v. Casey*, 518 U.S. 343 (1996); *see also McCoy*, 255 F. Supp. 2d at 260-61. "[A] delay in being able to work on one's own legal action or communicate with the court does not rise to the level of a constitutional violation." *Herrera v. Scully*, 815 F. Supp. 713, 725 (S.D.N.Y. 1993).

Here, plaintiff has not adequately alleged a constitutional claim for denial of access to the law library as he has not alleged that he suffered an actual injury as a result of allegedly being denied access to the law library, including facts that he was denied the ability to pursue a claim as a result of this deprivation as required by *Lewis*. Plaintiff has also failed to allege sufficient facts that to meet the pleading requirements of both the objective "sufficiently

serious" prong and the subjective culpability prong of the deliberate indifferent standard. *See* Discussion at Point III.A.2. at p. 7. Thus, all of his law library claims must be dismissed.

#### c.    Sick Call

Plaintiff has also failed to state a claim upon which relief can be granted in regards to his allegation that on some days there would be no sick call. *See* Amended Complaint, ¶ 18. Plaintiff has not alleged that he was denied the ability to go to sick call or that he suffered any physical injury or any other injury from not being allowed to go to sick call. *See* Discussion at Point II at pp. 4-5. Thus, plaintiff has failed to state a constitutional claim that he was denied the ability to go to sick call and this claim should be dismissed.

#### 8.    Staffing and Off-Housing Unit Activities

Plaintiff alleges that as a result of overcrowding and understaffing there was not enough staff to escort inmates to off-housing unit activities and consequently plaintiff was deprived of the opportunity to attend activities such as the law library, social services, and Muslim Services. Amended Complaint, ¶ 19. As discussed below, plaintiff has failed to state a constitutional claim upon which relief can be granted and these claims must be dismissed.

#### a.    Law Library

Plaintiff's law library claims should be dismissed. *See* Section 2.A.7.b, above.

#### b.    Social Services & Muslim Services[4]

Plaintiff's claims that due to overcrowding and understaffing he could not attend the social services and Muslim services "on many occasions". Amended Complaint, ¶ 19. These claims, however, do not rise to the level of constitutional violations. First, while an inmate might

---

[4] Plaintiff has not raised a claim under the First Amendment of the United States Constitution or under the Religious Land Use and Institutionalized Person Act, 42 U.S.C. §2000cc, in regards to his claim that he was denied the ability to attend Muslim services. Therefore, this claim will only be analyzed under the Eighth Amendment.

like to attend social services while incarcerated, the denial of the ability to attend such activities does not amount to a "sufficiently serious" deprivation or place the inmate at "substantial risk of serious harm." *See Beckford*, 151 F. Supp. 2d at 213. Furthermore, plaintiff has failed to allege facts sufficient to establish a culpable state of mind on the part of the defendants in regards to this claim so as to satisfy the second prong of the deliberate indifference standard. *See* Discussion at Point III.A.2. at p.7.

Similarly, plaintiff's claims in regards to his ability to attend Muslim services are also inadequate to state a constitutional violation. Although inmates have a right to have access to religious services (*Young v. Coughlin*, 866 F. 2d 567, 570 (2d Cir. 1989)), these rights are not absolute and must be balanced with the legitimate security needs of the institution. *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). Jail officials have a compelling government interest, due to legitimate security interests, in restricting inmates' attendance at religious and social services when there are not enough corrections officers to provide the necessary escort and related services needed for inmates to attend such activities. *Muhammed , et al. v. City of New York Dept of Corrections, et al.*, 904 F. Supp. 161 (S.D.N.Y. 1995) *appeal dismissed* 126 F. 3d 119 (2d Cir. 1997). In *Muhammed*, Muslim inmates alleged that DOC denied them the ability to practice their religion. The court held that DOC had not impermissibly burdened the inmates' ability to practice their religion and stated that even if plaintiffs could have made such a showing, defendants had a compelling state interest in imposing restrictions on the attendance of inmates at religious services. *Id* at 193-94. In particular, the court found that given the security concerns of the jail as well as large numbers of inmates to be managed at Riker's Island, the restrictions were compelling. *Id.* at 194. The Court also noted that the limited space available as well as the logistical problems that DOC faced having to move large numbers of inmates each

day throughout a large jail complex as well outside of the complex and the limited numbers of correctional officers to carry out these responsibilities, supported a finding that DOC's limitations on attendance of religious services served a compelling state interest. *Id.*

Here, like in *Muhammed*, defendants have a compelling state interest in maintaining the security of the EMTC. Restrictions imposed on inmates in attending a religious services when there were not sufficient numbers of correctional officers to escort them to such services, as discussed in *Muhammed*, is in furtherance of a compelling state interest are reasonably related to a legitimate institutional security interest.

Moreover, DOC's religion policy permits inmates to practice their religion and visit with a religious advisor of their choice, regardless of whether there are correctional officers available to transport them to organized services. Minimum Standards, § 1-08. Given the compelling state interest that DOC has in ensuring institutional security, as recognized in *Muhammed*, coupled with the facts that DOC policy allows an inmate to freely practice his or her religion, and plaintiff has not alleged that he has been denied this right, restricting inmate attendance at religious services at times when there are not enough correctional officers to transport plaintiff to Muslim services ( or other "social" activities) does not violate the Eighth Amendment. Consequently, plaintiff has failed to state a claim demonstrating an Eighth Amendment violation with regard to this claim.

### 9.    Exposure to Communicable Diseases

Plaintiff alleges that as a result of overcrowding at Riker's Island, defendants are "unable to provide adequate medical isolation of ill and infectious prisoners…" and that "inmates who have be designated as 'Medically Isolated' are mixed with the general population."

Amended Complaint, ¶ 21. Plaintiff also alleges that for a period of five weeks he was housed with an inmate who had tested positive for Tuberculosis ("TB"). *Id.*

To state a claim for constitutional violations resulting from exposure to communicable diseases, while an inmate need not allege an actual injury, he must allege a "substantial risk of serious harm" such that the exposure "posed an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 33. It must also be alleged that the disease or exposure is so serious "that to ignore the condition would violate contemporary standards of decency." *Id.*; *see also Wise, et al. v. Chassin, et al.*, 1997 U.S. Dist. LEXIS 20496, *7-8 (S.D.N.Y. Dec. 2, 1997)(exposure to latent TB).

Plaintiff's allegations here are insufficient to establish a constitutional violation. First, except for the TB to which plaintiff alleges he was exposed, plaintiff has failed to allege that he was exposed to any other diseases as a result of the is alleged condition of confinement or whether the diseases were so serious that the failure to prevent such exposure "would violate contemporary standards of decency", or that the exposure posed an unreasonable risk of serious damage to his future health.

In regards to his allegation that he was exposed to an inmate who had "tested positive" for TB, this claim to is insufficient to amount to a constitutional violation. The fact that an inmate tests positive for TB and is housed with others, alone, is not enough to meet the "sufficiently serious" prong of the deliberate indifference test. *Bolton v. Goord*, 992 F. Supp. 604, 628 (S.D.NY. 1998)(failure to exclude inmates who have tested positive for TB from double bunking does not present a sufficiently serious injury). In order to adequately plead a claim about such exposure, plaintiff must have alleged a "substantial risk of serious harm" such that the exposure to the inmate who tested positive for TB "posed an unreasonable risk of serious

damage to his future health." *Helling*, 590 U.S. at 33.   The allegations in the Amended Complaint do not suffice to meet such requirements and therefore must be dismissed.

Plaintiff has not alleged facts sufficient to demonstrate that defendants acted with a culpable state of mind. Specifically, plaintiff has not alleged that defendants were aware that the inmate with TB was housed in the same living area as plaintiff, that plaintiff suffered serious harm or an excessive risk of harm due to this alleged exposure, and that defendants disregarded this harm or risk of harm.   Plaintiff's generalized allegations are insufficient to meet pleading requirements to allege deliberate indifference. *See* Discussion at Point III.A.2 at p. 7.

**10.    Unsanitary Conditions**

Plaintiff alleges that his dining and dormitory areas were "infested with insects, mice, and other vermin and that food was often served on unclean trays." Amended Complaint, ¶ 19.   "The mere presence of vermin in a prisoner's housing area does not constitute 'punishment' under the Eighth Amendment." *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)(plaintiff failed to state a claim where he alleged his cell was infested with roaches and was cold (*Id.* at 243)) *citing Benjamin v. Fraser*, 161 F. Supp. 2d 151, 174 (S.D.N.Y 2001).

Here, plaintiff's allegations of insects, mice and other vermin in his living area and food served on unclean trays does rise to the level of a constitutional violation.   Plaintiff has not alleged a deprivation that was sufficiently serious to meet the objective prong of the deliberate indifference test (see *McCoy*, 255 F. Supp. 2d at 260)) and plaintiff has failed to allege any that he suffered an actual physical injury resulting from these alleged unsanitary conditions. Additionally, because plaintiff is no longer at EMTC he is not at risk of such future injury. He also not alleged sufficient facts that defendants acted with a culpable state of mind. This allegation fails to state a claim and should be dismissed.

B.    **Plaintiff Has Failed to Allege A Viable *Monell* Claim**

In order to state a § 1983 claim against a municipality, a plaintiff must allege that an unconstitutional act occurred pursuant to an official policy or custom. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978). Local governments can only be sued directly under § 1983 for monetary, declaratory, or injunctive relief "where the action that is alleged to have violated federal law 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Comm. Health Care Ass'n v. DeParle*, 69 F. Supp. 2d 463, 474 (S.D.N.Y. 1999) *quoting Monell*, 436 U.S. at 690. There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" and that the municipality can be faulted for the deprivation. *Caminero v. Rand*, 882 F. Supp. 1319, 1323 (S.D.N.Y. 1995) *quoting City of Canton v. Harris*, 489 U.S. 378, 385 (1989). If a plaintiff cannot prove any set of facts to show an underlying constitutional violation, he cannot prove a claim of liability against a municipality under 42 U.S.C. § 1983. *See Zahra v. Town of Southerland*, 48 F. 3d 674, 685 (2nd Cir. 1995)(to succeed on a §1983 claim against a municipality, plaintiff must prove denial of a constitutional right).

Here, because plaintiff has not pled sufficient facts demonstrating a constitutional violation and thus has failed to allege facts to sufficient to show municipal liability. *See Monell*, 436 U.S. at 694. The claims against New York City should be dismissed.

## POINT IV

**CLAIMS AGAINST DEFENDANTS HORN LANGSTON, & DAVIS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE THEIR PERSONAL INVOLVEMENT IN THE INCIDENTS ALLEGED IN THE COMPLAINT**

It is well settled that in order to bring a § 1983 claim against an individual for civil rights violations for damages, a plaintiff must specifically allege personal involvement of the individual against whom such claims are being brought. *See Colon v. Coughlin*, 58 F. 3d 865, 873 (2nd Cir. 1995). The failure to specifically plead such allegations is fatal to the complaint. *See Finger*, 2004 U.S. Dist. LEXIS 11048, at * 18. A theory of *respondeat superior* cannot form the basis of such liability. *Id.* Supervisory liability can only be shown by:

> actual direct participation in the constitutional violation, (2) the failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned the conduct amounting to a constitutional violation or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Richardson v. Goord*, 347 F. 3d 431, 435 (2nd Cir. 2003).

Here, plaintiff did not allege that Horn, Davis, or Davis were personally involved in the incidents alleged in the Complaint. *See generally* Amended Complaint. The only allegation that Langston was specifically aware of plaintiff's conditions of confinement was in regards to the issue of lack of personal supplies. *See* Discussion at Point III.A.5 at p. 13. Plaintiff alleges that he sent her a letter about this problem but the problem went unaddressed. Amended Complaint, ¶ 16. The fact that an official receives a letter complaining about a particular issue is not, however, sufficient to establish § 1983 liability. *Islam*, 2008 U.S. Dist. LEXIS 1464, at *6.

Plaintiff has also not alleged facts that Horn, Davis, or Langston were grossly negligent in supervising their subordinates or any facts that they failed to act on information that unconstitutional acts were occurring. Rather, plaintiff has made only conclusory allegations that their "policies, procedures, acts, and omissions with respect to overcrowding at EMTC" caused plaintiff to be deprived of adequate shelter, reasonable safety, and basic human

needs and placed him at "unreasonable risk of increased violence, illness, mental suffering, and deteriorating health" *Id.*, ¶35. Plaintiff also makes conclusory allegations that "defendants knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety." *Id.*, ¶ 36. These allegations, however, are merely conclusory. *See* Discussion at Point III, A.2 at p. 7  These allegations are thus, insufficient to allege a § 1983 claim. *See Renelique v. Doe, et al.*, 2002 U.S. Dist. LEXIS 26980, at *14-16.  Defendants Horn, Davis, and Langston therefore, cannot be liable for damages under § 1983 and these claims should be dismissed.

## POINT V

### PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING

Plaintiff has raised numerous claims for which he lacks standing to bring.   In order for a plaintiff to have standing to bring an action, the Supreme Court has held that:

> "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992) (footnote, citations, and internal quotation marks omitted) . . . In light of these principles, we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power.

*United States v. Hayes*, 515 U.S. 737, 742 (1995)(citations omitted), *see also Lewis*, 518 U.S. at 349. (In prisoner case alleging violation of inmates' rights to access to the law library, Supreme Court held that  a claimant must "have suffered, or will imminently suffer, actual harm").

-24-

Here, plaintiff makes a number of conclusory allegations that do not satisfy these strict standing requirements as he has not alleged an "injury in fact" that is "concrete and particularized" and "actual or imminent", such as his law library and sick call claims, among others. *See* Discussion at Point III.A.7.b & c. Plaintiff's claims for which he no standing must be dismissed for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

## CONCLUSION

**WHEREFORE**, defendants respectfully request that their motion to dismiss the Complaint be granted and that plaintiff's request for relief be denied in all respects.

Dated: New York, New York
January 18, 2008

> **MICHAEL A. CARDOZO**
> Corporation Counsel of the
>   City of New York
> Attorney for Defendant
> 100 Church Street, Room 2-185
> New York, New York 10007
> (212) 788-0408
> By:
>
> _____
>   Deborah A. Dorfman
>   Assistant Corporation Counsel

TO: Stroock, Stroock & Lavan, LLP, Counsel for Plaintiff

# APPENDIX I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DARRELL BUSH

                 Plaintiff,

    vs.

THE CITY OF NEW YORK, MARTIN F. HORN,
in his individual and official capacity as
Commissioner of the New York City Department of
Corrections, SANDRA LANGSTON, in her
individual and official capacity as Warden of the Eric
M. Taylor Center, JOANDREA DAVIS, in her
individual and official capacity as Warden of the Eric
M. Taylor Center

                Defendants.

**AMENDED COMPLAINT**

Civil Action No. 07 Civ 4019 (RPP)

Plaintiff DARRELL BUSH, by and through his attorneys Stroock & Stroock & Lavan

LLP, alleges upon knowledge as to himself and upon information and belief as to all other

matters as follows:

## PRELIMINARY STATEMENT

1.      Mr. Bush files this action pursuant to 42 U.S.C. § 1983 seeking redress of injuries

he suffered while in the custody of the New York City Department of Corrections (the "DOC")

for deprivation under color of state law of the rights, privileges and immunities secured to him

by the United States Constitution and in particular the Eighth and Fourteenth Amendments

thereof.

2.      Specifically, Mr. Bush challenges and seeks redress for various conditions and

circumstances of confinement at Rikers Island which fall below the standards of human decency,

inflict needless suffering and caused him to be deprived of several of life's basic necessities.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and
1343.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as events giving rise
to this action occurred within this District.

## PARTIES

5.      Mr. Bush was confined in the Eric M. Taylor Center ("EMTC) for approximately
245 days, commencing on November 1, 2006.  He is no longer an inmate at EMTC.

6.      Defendant City of New York is a municipal corporation, which through its
department of Correction, operates a number of detention jails.  The DOC, through its senior
officials at the central office, in each facility, promulgated and implements policies.  In addition,
senior officials in the DOC are aware of and tolerate certain practices by subordinate employees
in the jails, including those that are inconsistent with formal policy.  These practices, because
they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute
unwritten DOC policies or customs.  The Department is also responsible for the appointment,
training, supervision and conduct of all DOC personnel, including the defendants referenced
herein.

7.      Defendant Martin F. Horn is and was at all times relevant to this action, the
Commissioner of the DOC.  On information and belief, Defendant Horn, as Commissioner of the
DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all
DOC matters and was responsible for the training, supervision, and conduct of all DOC
personnel including the defendants referenced herein.  Defendant Horn is and was at all relevant

2

times, responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York. He is sued in his official and individual capacities.

8.    Defendant Sandra Langston was for a portion of the time relevant to this action, the Warden of EMTC. In that capacity, Defendant Langston was ultimately responsible for the care, custody, and safe treatment of those inmates in EMTC. She is sued in her official and individual capacities.

9.    Defendant Joandrea Davis is and was for a portion of the time relevant to this action, the Warden of EMTC. In that capacity, Defendant Davis is ultimately responsible for the care, custody, and safe treatment of those inmates in EMTC. She is sued in her official and individual capacities.

10.    At all relevant times herein, Defendants Horn, Langston and Davis, were each a "person" for purposes of 42 U.S.C. §1983, and acted under color of law to deprive Mr. Bush of his Constitutional rights, as set forth more fully below.

## FACTUAL ALLEGATIONS

### A. The Conditions of Mr. Bush's Confinement Violated the Eighth Amendment

11.    From the time that the first jail opened in New York City, overcrowding has been a recurring problem.

12.    According to the DOC, it now averages a daily inmate count of between 16,500 to 20,000. This number is greater than the entire state prison population of most states.

3

13.    Most of these inmates are housed on Rikers Island, where the facilities are overcrowded.

14.    At EMTC, Mr. Bush was housed in a dorm commonly known as "11 Upper." While 11 Upper was only designed to house 48 men, 60 men were being housed in this dorm during the period of Mr. Bush's confinement. The men slept and bathed without any privacy. Due to these overcrowded conditions, Mr. Bush was forced to sleep in conditions where his bed touched his locker, and where there was only approximately 1 foot of space between his and other inmates' beds. These conditions are in clear violation of §1-05 of the City of New York's own minimum standards concerning overcrowding in correctional facilities. Upon information and belief, the City's failure to provide the mandated amount of sleeping space to inmates in EMTC was the result of overcrowding.

15.    In 11 Upper, there were regular, ongoing deprivations of basic health and hygiene supplies, such as, but not limited to, soap, detergent, toothpaste, razors, toilet paper, and blankets because there were inadequate quantities to supply the inmates being housed therein. Because of overcrowding, supplies for 50 men would routinely be provided to a 60-man dorm. These conditions directly led to increased stress levels, physical discomfort, medical risk and acts of aggression.

16.    Mr. Bush complained to Deputy Warden Larza about Captain Rughbart, the Environmental Housing Officer in charge of distributing supplies. When the shortages persisted, Mr. Bush wrote to the DOC's central office at 60 Hudson Street and to Warden Sandra Langston about Captain Rughbart's performance and the lack of basic supplies. Despite these various appeals, the situation was never remedied.

4

17.    During Mr. Bush's confinement, laundry services were also insufficient to provide each inmate in EMTC with a clean change of clothing at least twice per week, and clean towels and bed linens once a week, in accordance with § 1-04 of the City of New York's own minimum standards concerning personal hygiene.  Upon information and belief, the City could not meet these mandates due to overcrowding.

18.    While in EMTC, Mr. Bush was also routinely deprived of the opportunity for exercise, recreation, and law library because they were offered to his overcrowded housing unit at the same time as other activities such as commissary, meals, sick call, etc.  Upon information and belief, these scheduling practices, which violate §§ 1-07 and 1-09 of the City of New York's own minimum standards for correctional facilities, are the function of an over-taxed facility which does not have the space or the resources to accommodate all the inmates it is housing.  On some days, sick call would not be called at all.

19.    Further, due to the overcrowding and understaffing at EMTC, there were not enough officers to escort inmates moving between various areas of the correctional facility.  On average, there was only one officer-escort available per 400 inmates in EMTC.  As a result of these conditions, Mr. Bush was deprived of the opportunity to attend activities outside his housing unit, or his time at such activities was cut so short as to be rendered useless.  On numerous occasions, Mr. Bush wanted to go to the law library, social services, and Muslim services, but could not because there were not enough corrections officers available to escort him.

20.    Certain activities and services have been diminished or have become unavailable altogether due to the overcrowded conditions on Rikers Island.   For example, during the period

5

of Mr. Bush's confinement, the already cramped law library was also being used to interview

inmates for discharge planning, and the indoor gym was being used to conduct inmate intake

orientation, administer suicide prevention testing, and hold John Jay college. In the winter

months, inmates are not provided with warm, water resistant clothing or footwear to wear in the

yard, and there is inadequate, indoor gym space to accommodate the number of inmates housed

in EMTC. During his entire 245-day period of confinement, Mr. Bush never had the opportunity

to go to the gym.

21.    Due to the overcrowded conditions on Rikers Island, the DOC is unable to

provide adequate medical isolation of ill and infectious prisoners either. On the contrary,

inmates who have been designated as "Medically Isolated," or "MI" are mixed with the general

population. For example, an inmate who had tested positive for Tuberculosis was placed in Mr.

Bush's housing unit, posing a direct threat to the health and safety of the inmates there. This

individual remained in EMTC for a five week period before he was released on discharge.

22.    The effect of these deprivations was only compounded by the unsanitary living

conditions in EMTC. The mess hall and dormitory areas were infested with insects, mice, and

other vermin, and food was often served on unclean trays. Overcrowding exacerbated the

unsanitary conditions, which in turn made the overcrowding only more dangerous and inhumane.

23.    The totality of the circumstances described above constitute a failure to provide

Mr. Bush the basic necessities of life during his confinement. Overcrowding and its effects,

including inadequate shelter and sanitation, have caused genuine deprivation and hardship over

an extended period of time for Mr. Bush. Such harsh conditions and restrictions are

incompatible with contemporary standards of decency, cause wanton and unnecessary infliction of pain, and are not reasonably related to any legitimate penological objectives.

24.    As a result of the foregoing, Mr. Bush was subjected to cruel and unusual punishment in violation of the Eighth Amendment.

## B. The City of New York's Inmate Grievance Procedure Was Not Available to Mr. Bush

25.    Special circumstances excuse Mr. Bush's failure to grieve or fully exhaust his administrative remedies.

26.    Upon arrival at EMTC, Mr. Bush did not receive an inmate handbook or a copy of the grievance procedures.

27.    Grievance forms are not readily available to the inmates in EMTC. In fact, Mr. Bush obtained the correct form from an inmate in C-73 and supplied the law library with a copy. Upon information and belief, the grievance coordinator in EMTC, Mr. Mulvaine, encouraged inmates to fill out interview slips to pre-screen and discourage the submission of grievances.

28.    Mr. Bush filed approximately 20 grievances regarding the conditions at EMTC by submitting the grievances to the box provided for that purpose, and never received a response to a single one of his grievances.

29.    On approximately 5 occasions, Mr. Bush approached Mr. Mulvaine, EMTC's grievance coordinator in the hallway and requested a grievance hearing. Officer Castro witnessed at least one such request. Mr. Mulvaine replied that Mr. Bush could not request a hearing, but that he instead had no choice but to wait to be summoned. Mr. Bush was never

7

called for a grievance hearing on any of the grievances he submitted. During his entire 245-day confinement at ETMC, Mr. Bush was not aware of any inmate who had actually been called for a grievance hearing.

30.    Mr. Bush wrote to the DOC's central office at 60 Hudson Street, seeking relief. In their response, they referred to the section that discusses the grievance procedure in the inmate handbook (which he did not have, until he obtained a copy from a corrections officer). The response letter did not inform Mr. Bush that he could appeal a grievance to the next level in the event the grievance was not decided in a particular time frame.

31.    Upon information and belief, it is an official, unwritten policy of the DOC to ignore most of the grievances it receives from the inmate population, so as to frustrate and impede the claims of unsophisticated parties such as Mr. Bush.

32.    Upon information and belief, Defendants routinely deprive inmates of access to the grievance procedure, to stymie complaints regarding conditions of confinement and thereafter avail themselves of a non-exhaustion defense which further frustrates, if not stifles, inmates like Mr. Bush from pursuing valid legal claims concerning the overcrowded conditions in EMTC.

33.    This policy and practice rendered the grievance procedure unavailable to Mr. Bush.

**[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

<u>COUNT I</u>
**Violation of the Eighth and Fourteenth Amendments and 42 U.S.C. §1983
Against Defendants Horn, Langston, and Davis**

34.    Mr. Bush repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

35.    Defendants' policies, practices, acts, and omissions with respect to overcrowding at EMTC deprived Plaintiff of adequate shelter, reasonable safety, and basic human needs, and placed Mr. Bush at unreasonable risk of increased violence, illness, mental suffering, and deteriorating health.

36.    Defendants knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety, but failed to take necessary or appropriate action to rectify those conditions. Defendants were deliberately indifferent to the serious hardship inflicted on Mr. Bush by the unconstitutional conditions of his confinement, and to the concomitant infringement of his rights.

37.    By reason of the foregoing, and by subjecting Mr. Bush to overcrowding and its effects, Defendants deprived Plaintiff of rights, remedies, privileges, and immunities secured by 42 U.S.C. §1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

38.    Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC officers and employees. Defendants' acts, or failures to act, were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. These Defendants acted willfully, knowingly, and with the

9

specific intent to deprive Mr. Bush of his constitutional rights secured by 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution.

39.     As a direct and proximate result of the facts alleged, Mr. Bush sustained the damages alleged above.

## COUNT II

### Violation of the Eighth and Fourteenth Amendments and 42 U.S.C. §1983 Against Defendant City of New York

40.     Mr. Bush repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

41.     Defendant's policies, practices, acts, and omissions with respect to overcrowding at EMTC deprived Plaintiff of adequate shelter, reasonable safety, and basic human needs, and placed Mr. Bush at unreasonable risk of increased violence, illness, mental suffering, and deteriorating health.

42.     Defendant knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety, but failed to take necessary or appropriate action to rectify those conditions.

43.     Defendant the City of New York, through the DOC, and acting under pretense and color of law, did permit, tolerate, and act with deliberate indifference to a pattern and practice of overcrowded conditions at Rikers Island.  This widespread tolerance of overcrowding and its effects constitutes a municipal policy, practice, or custom, and led to Mr. Bush's injuries.

44.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Bush was subject to overcrowding and its effects, Defendant the City of New York has deprived Mr. Bush of rights, remedies, privileges, and immunities secured by 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution.

45.     As a direct and proximate result of the facts alleged, Mr. Bush sustained the damages alleged above.

### JURY DEMAND

46.     Mr. Bush demands a trial by jury in this action.

**[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

11

## PRAYER FOR RELIEF

WHEREFORE, Mr. Bush respectfully prays for judgments against the Defendants as

follows:

(a) Awarding compensatory damages for violations of 42 U.S.C. §§
1983;

(b) Awarding reasonable attorneys' fees and costs of this action,
pursuant to 42 U.S.C. § 1988; and

(c) Awarding such other relief as this Court may deem just and proper.

Dated:  New York, New York
        November 15, 2007

                              STROOCK & STROOCK & LAVAN LLP

                              By: _____
                                  James L. Bernard (JB-4273)
                                  Kevin J. Curnin (KC-3561)
                                  Ilana Cutler (IC-3378)
                                  Michelle H. Schott (MS-1039)
                                  180 Maiden Lane
                                  New York, New York 10038-4982

                                  *Attorneys for Plaintiff*

12

APPENDIX II

The City of New York

Board of Correction

# MINIMUM STANDARDS FOR NEW YORK CITY CORRECTIONAL FACILITIES

CITY OF NEW YORK
MICHAEL R. BLOOMBERG, Mayor

## (i) Bedding

(1) By September 1, 1978, upon admission to an institution, all prisoners shall be provided at Department expense with an issue of bedding, including but not limited to:

(i) two sheets;

(ii) one pillow;

(iii) one pillow case;

(iv) one mattress;

(v) one mattress cover; and

(vi) sufficient blankets to provide comfort and warmth

(2) Prior to being issued, all bedding items shall be checked for damage and repaired or cleaned, if necessary

(3) Pillowcases and sheets shall be cleaned at least once each week. Blankets shall be cleaned at least once every three months

(4) Mattresses shall be cleaned at least once every six months

(5) Mattresses must be constructed of fire retardant materials Mattress covers must be constructed of materials both water resistant and easily sanitized

All items of clothing and bedding stored within the institution shall be maintained in a safe and sanitary manner

## (h) Housing Areas

(1) Prisoners shall be provided at Department expense with a supply of brooms, mops, soap powder, disinfectant, and other materials sufficient to property clean and maintain housing areas

(2) The Department shall develop a plan for the regular cleaning of all housing areas, including cells, tiers, dayrooms, and windows, and for the extermination of rodents and vermin in all housing areas. Such plans shall be submitted to the Board within 90 days of the effective date of this standard

(3) All housing areas shall contain at least the following facilities in sufficient supply to meet reasonable standards of prisoner personal hygiene:

(i) sink with hot and cold water;

(ii) flush toilet; and

(iii) shower with hot and cold water

## SECTION 1-05 OVERCROWDING

### (a) Policy

Prisoners shall not be housed in cells, rooms or dormitories unless adequate space and furnishings are provided

## (b) Single Occupancy

(1) A cell or room designed or rated for single occupancy shall house only one prisoner

(2) Each single cell shall contain a flush toilet, a washbasin with drinking water and, at a minimum, the following furniture:

(i) a single bed; and

(ii) by September 1, 1978, a locker or drawer that can be closed

(3) A single-cell housing area shall contain table or desk space for each occupant that is available for use at least 12 hours per day

## (c) Multiple Occupancy

(1) A multiple occupancy area shall contain a single bed for each occupant, a locker or drawer that can be closed for each occupant, and by September 1, 1978, table or desk space for each occupant that is available for use at least 12 hours per day

(2) Multiple occupancy areas shall provide a minimum of 60 square feet of floor space per person in the sleeping area

(3) A multiple occupancy area shall provide a minimum of one operable toilet and shower for every 8 prisoners and one operable sink for every 10 prisoners Toilets shall be accessible for use without staff assistance 24 hours per day

(4) A multi-occupancy area shall provide a dayroom space that is physically and acoustically separate from but immediately adjacent and accessible to the sleeping area

(5) A multi-occupancy area shall house no more than:

(i) 50 Detainees

(ii) 60 Sentenced Prisoners Section 1-05 (5-ii) shall be applicable to all multi-occupancy areas opened after July 1, 1985

## SECTION 1-06 LOCK-IN

### (a) Policy

The time spent by prisoners confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the institution

### (b) Involuntary Lock-in

No prisoner shall be required to remain confined to his or her cell except for the following purposes:

(1) At night for count or sleep, not to exceed eight hours in any 24-hour period;

(2) During the day for count or required institutional business that can only be carried out while prisoners are locked in, not to exceed two hours in any 24-hour period. This time may be extended if necessary to complete an off count

(3) Within 60 days of the effective date of this standard, the Department shall submit to the Board its list of institutions, if any, that require more than two hours of lock-in during the day because of unique problems Pursuant to Section 1-16, the Board shall determine if any variance from the requirement of Section 1-06 (b) (2) is necessary

(c) Optional lock-in

(1) Prisoners shall have the option of being locked in their cells during lock-out periods Prisoners choosing to lock in at the beginning of a lock-out period of two hours or more, shall be locked out upon request after one-half of the period At this time, prisoners who have been locked out shall be locked in upon request

(2) The Department may deny optional lock-in to a prisoner in mental observation status if a psychiatrist or psychologist determines in writing that optional lock-in poses a serious threat to the safety of that prisoner. A decision to deny optional lock-in must be reviewed every ten days, including a written statement of findings, by a psychiatrist or psychologist Decisions made by a psychiatrist or psychologist pursuant to this Section must be based on personal consultation with the prisoner

(d) Schedule

Each institution shall maintain and distribute to all prisoners or post in each housing area its lock-out schedule, including the time during each lock-out period when prisoners may exercise the options provided by Section 1-06(c)

## SECTION 1-07 RECREATION

(a) Policy

Prisoners shall be provided with adequate indoor and outdoor recreational opportunities

(b) Recreation Areas

By September 1, 1978, indoor and outdoor recreation areas of sufficient size to meet the requirements of this part shall be established and

maintained by each institution. An outdoor recreation area must allow for direct access to sunlight and air

(c) Recreation Schedule

Recreation periods shall be at least one hour; only time spent at the recreation area shall count toward the hour Recreation shall be available five days per week in the outdoor recreation area, except in inclement weather when the indoor recreation area shall be utilized By September 1, 1978, such recreation shall be available daily

(d) Recreational Equipment

The Department shall make available to prisoners an adequate amount of equipment during the recreation period. A list of the equipment available at each institution shall be submitted to the Board within 30 days of the effective date of this standard

(e) Recreation Within Housing Area

(1) Prisoners shall be permitted to engage in recreation activities within cell corridors and tiers, dayrooms and individual housing units. Such recreation may include but is not limited to:
(i) table games;
(ii) exercise programs; and
(iii) arts and crafts activities

(2) Recreation taking place within cell corridors and tiers, dayrooms and individual housing units shall supplement, but not fulfill, the requirements of Section 1-07 (c)

(f) Recreation for Prisoners in Segregation

Prisoners confined in administrative or punitive segregation shall be permitted recreation in accordance with Section 1-07 (c)

## SECTION 1-08 RELIGION

(a) Policy

Prisoners have an unrestricted right to hold any religious belief, and to be a member of any religious group or organization, as well as to refrain from the exercise of any religious beliefs. A prisoner may change his or her religious affiliation

(b) Exercise of Religious Beliefs

(1) Prisoners are entitled to exercise their religious beliefs in any manner that does not constitute a clear and present danger to the safety or security of an institution

(2) No employee or agent of the Department or of any voluntary program shall be permitted to proselytize or seek to convert any

prisoner, nor shall any prisoner be compelled to exercise or be dissuaded from exercising any religious belief

(3) Equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs except when such exercise is unduly disruptive of institutional routine

(c) **Congregate Religious Activities**
(1) Consistent with the requirements of Section 1-08(a), all prisoners shall be permitted to congregate for the purpose of religious worship and other religious activities
(2) Each institution shall provide all prisoners access to an appropriate area for congregate religious worship and other religious activities Consistent with the requirements of Section 1-08(b)(1), this area shall be made available to prisoners in accordance with the practice of their religion

(d) **Religious Advisors**
(1) As used in this part, the term "religious advisor" shall mean a person who has received ecclesiastical endorsement from the relevant religious authority
(2) Religious advisors shall be permitted to conduct congregate religious activities permitted pursuant to Section 1-08(c) When no religious advisor is available, a member of a prisoner religious group may be permitted to conduct congregate religious activities
(3) Consistent with the requirements of Section 1-08(b) (1), prisoners shall be permitted confidential consultation with their religious advisors during lock-out periods

(e) **Celebration of Religious Holidays or Festivals**
Consistent with the requirements of Section 1-08(b) (1), prisoners shall be permitted to celebrate religious holidays or festivals on an individual or congregate basis

(f) **Religious Dietary Laws**
Prisoners are entitled to the reasonable observance of dietary laws or fasts established by their religion. Each institution shall provide prisoners with food items sufficient to meet such religious dietary laws

(g) **Religious Articles**
Consistent with the requirements of Section 1-08(b) (1), prisoners shall be entitled to wear and to possess religious medals or other religious articles, including clothing and hats

12

(h) **Exercise of Religious Beliefs by Prisoners in Segregation**
(1) Prisoners confined in administrative or punitive segregation shall not be prohibited from exercising their religious beliefs, including the opportunities provided by Sections 1-08 (d), 1-08 (e), 1-08 (f), and 1-08 (g)
(2) Congregate religious activities by prisoners in administrative or punitive segregation shall be provided for by permitting such prisoners to attend congregate religious activities with appropriate security either by themselves or with other prisoners

(i) **Recognition of a Religious Group or Organization**
(1) A list shall be maintained of all religious groups and organizations recognized by the Department This list shall be in Spanish and English and shall be distributed to all incoming prisoners or posted in each housing area
(2) Each institution shall maintain a list of the religious advisor, if any, for each religious group and organization, and the time and place for the congregate service of each religion. This list shall be in Spanish and English and shall be distributed to all incoming prisoners or posted in each housing area
(3) Prisoner requests to exercise the beliefs of a religious group or organization not previously recognized shall be made to the Department
(4) In determining requests made pursuant to paragraph (3) of this subdivision, the following factors among others shall be considered as indicating a religious foundation for the belief:
(i) whether there is substantial literature supporting the belief as related to religious principle;
(ii) whether there is formal, organized worship by a recognizable and cohesive group sharing the belief;
(iii) whether there is an informal association of persons who share common ethical, moral, or intellectual views supporting the belief; or
(iv) whether the belief is deeply and sincerely held by the prisoner
(5) In determining requests made pursuant to paragraph (3) of this subdivision, the following factors shall not be considered as indicating a lack of religious foundation for the belief:
(i) the belief is held by a small number of individuals;
(ii) the belief is of recent origin;
(iii) the belief is not based on the concept of a Supreme Being or its equivalent; or
(iv) the belief is unpopular or controversial

13

(6) In determining requests made pursuant to paragraph (3) of this subdivision, prisoners shall be permitted to present evidence indicating a religious foundation for the belief

(7) The procedure outlined in Sections 1-08(i)(1) and 1-08(i)(3) shall apply when a prisoner request made pursuant to Section 1-08 (i)(3) is denied

(j) **Limitations on the Exercise of Religious Beliefs**
(1) Any determination to limit the exercise of the religious beliefs of any prisoner shall be made in writing and shall state the specific facts and reasons underlying such determination. A copy of this determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within 24 hours of the determination

(2) This determination must be based on specific acts committed by the prisoner during the exercise of his or her religion that demonstrate a serious and immediate threat to the safety and security of the institution Prior to any determination, the prisoner must be provided with written notification of the specific charges and the names and statements of the charging parties, and be afforded an opportunity to respond

(3) Any person affected by a determination made pursuant to this subdivision may appeal such determination to the Board

(i) The person affected by the determination shall give notice in writing to the Board and the Department of his or her intent to appeal the determination

(ii) The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination

(iii) The Board or its designate shall issue a written decision upon the appeal within 14 business days after it has received notice of the requested review

**SECTION 1-09 ACCESS TO COURTS**

(a) **Policy**
Prisoners are entitled to access to courts, attorneys, legal assistants and legal materials

(b) **Judicial and Administrative Proceedings**
(1) Prisoners shall not be restricted in their communications with courts or administrative agencies pertaining to either criminal or civil proceedings

14

(2) Timely transportation shall be provided to prisoners scheduled to appear before courts or administrative agencies Vehicles used to transport prisoners must meet all applicable safety and inspection requirements and provide adequate ventilation, lighting and comfort

(c) **Access to Counsel**
(1) Prisoners shall not be restricted in their communication with attorneys. The fact that a prisoner is represented by one attorney shall not be grounds for preventing him or her from communicating with other attorneys Any properly identified attorney may visit any prisoner with the prisoner's consent

(i) An attorney may be required to present identification to a designated official at the central office of the Department in order to obtain an institutional pass This pass shall remain in effect for a minimum of three years and shall permit the attorney to visit any prisoner under the custody of the Department

(ii) The Department may only require such identification that is normally possessed by an attorney

(2) The Department may limit visits to any attorney of record or an attorney with a court notice for prisoners undergoing examination for competency pursuant to court order

(3) Visits between prisoners and attorneys shall be kept confidential and protected, in accordance with provisions of Section 1-10 Legal visits shall be permitted at least eight hours per day between 8 am and 8 pm During business days, four of those hours shall be 8 am to 10 am, and 6 pm to 8 pm The Department shall maintain and post the schedule of legal visiting hours at each institution

(4) Mail between prisoners and attorneys shall not be delayed, read, or interfered with in any manner, except as provided in Section 1-12

(5) Telephone communications between prisoners and attorneys shall be kept confidential and protected, in accordance with the provisions of Section 1-11

(d) **Access to Co-defendants**
Upon reasonable request, regular visits shall be permitted between a detainee and all of his or her co-defendants who consent to such visits. If any of the co-defendants are incarcerated, the Department may require that an attorney of record be present.

15

**(e) Attorney Assistants**

(1) Law students, legal paraprofessionals, and other attorney assistants working under the supervision of an attorney representing a prisoner shall be permitted to communicate with prisoners by mail, telephone and personal visits, to the same extent and under the same conditions that the attorney may do so for the purpose of representing the prisoner Law students, legal paraprofessionals and other attorney assistants working under the supervision of an attorney contacted by prisoner shall be permitted to communicate with that prisoner by mail, telephone, or personal visits to the same extent and under the same conditions that the attorney may do so

(2) An attorney assistant may be required to present a letter of identification from the attorney to a designated official at the central office of the Department in order to obtain an institutional pass. A pass shall not be denied based upon any of the items listed in Section 1-10 (h) (1)

(3) The pass shall remain in effect for a minimum of one year and shall permit the assistant to perform the functions listed in Section 1-09 (e) It may be revoked if specific acts committed by the legal assistant demonstrate his or her threat to the safety and security of an institution This determination must be made pursuant to the procedural requirements of Section 1-10 (h) (2), 1-10 (h) (4) and 1-10 (h) (5)

**(f) Law Libraries**

Each institution shall maintain a properly equipped and staffed law library

(1) The law library shall be located in a separate area sufficiently free of noise and activity and with sufficient space and lighting to permit sustained research

(2) Each law library shall be open for a minimum of five days per week including at least one weekend day In facilities with more than 600 prisoners, each law library shall be open for a minimum often hours during lock-out hours, on days of operation in facilities with 600 or fewer prisoners, each law library shall be open for a minimum of eight and a half hours during lock-out hours, on days of operation In all facilities, the law library shall be open on all days of operation for at least three hours between 6 pm and 10 pm The law library will be kept open for prisoners use on all holidays which fall on regular law library days except:

New Year's Day
July 4th
Thanksgiving
Christmas

16

The law library may be closed on holidays other than those specified provided that law library services are provided on either of the two days of the same week the law library is usually closed On holidays on which the law library is kept open, it shall operate for a minimum of eight hours No changes to law library schedules in effect on January 1, 1986, shall be made without written notice to the Board of Correction, which must be received at least five business days before the planned change(s) is to be implemented

(3) The law library schedule shall be arranged to provide access to prisoners during times of the day when other activities such as recreation, commissary, meals, school, sick call, etc are not scheduled Where such considerations cannot be made, prisoners shall be afforded another opportunity to attend the law library at a later time during the day

(4) Each prisoner shall be granted access to the law library for a period of at least two hours per day each day the law library is open. Upon request, extra time may be provided as needed, space and time permitting. In providing extra time, prisoners on trial and those with an impending court deadline, shall be granted preference

(5) The law library hours for prisoners in punitive segregation may be reduced or eliminated, provided that an alternative method of access to legal materials is instituted to permit effective legal research

(6) Legal research classes for general population prisoners shall be conducted at each facility on at least a quarterly basis Legal research training materials shall be made available upon request to prisoners in special housing

(7) The Department shall periodically report to the Board detailing the resources available at the law library at each institution, including a list of titles and dates of all law books and periodicals and the number, qualifications and hours of English and Spanish-speaking legal assistants

**(g) Legal Documents and Supplies**

(1) Each law library shall contain necessary research and reference materials, which shall be kept properly updated and supplemented, and shall be replaced without undue delay when materials are missing or damaged

(2) Prisoners shall have reasonable access to typewriters and photocopiers for the purpose of preparing legal documents A sufficient number of operable typewriters and a photocopy machine will be provided for prisoner use

17

(3) Legal clerical supplies, including pens, legal paper and pads and carbon paper shall be made available for purchase by prisoners. Such legal clerical supplies shall be provided to indigent prisoners at Department expense.

(4) Unmarked legal forms which are commonly used by prisoners shall be made available. Each prisoner shall be permitted to use or make copies of such forms for his or her own use.

**(h) Law Library Staffing**

(1) During all hours of operation, each law library shall be staffed with trained civilian legal coordinator(s) to assist prisoners with the preparation of legal materials Legal coordinator coverage shall be provided during extended absences of the regularly assigned legal coordinator(s)

(2) Each law library shall be staffed with an adequate number of permanently assigned correction officers knowledgeable to law library procedures

(3) Spanish speaking prisoners shall be provided assistance in use of the law library by employees fluent in the Spanish language on an as needed basis

**(i) Number of Legal Documents and Research Materials**

(1) Prisoners shall be permitted to purchase and receive an unrestricted number of law books and other legal research materials from any source

(2) Reasonable regulations governing the keeping of materials in cell and the searching of cells may be adopted, but under no circumstances may prisoners legal documents, books, and papers be read or confiscated by correctional personnel without a lawful warrant Where the space in a cell is limited, an alternative method of safely storing legal materials elsewhere in the institution is required, provided that a prisoner shall have regular access to these materials

**(j) Limitation of Access to Law Library**

(1) A prisoner may be removed from the law library if he or she disrupts the orderly functioning of the law library or does not use the law library for its intended purposes A prisoner may be excluded from the law library for more than the remainder of one law library period only for a disciplinary infraction occurring within a law library

(2) Any determination to limit a prisoner's right of access to the law library shall be made in writing and shall state the specific facts and reasons underlying such determination A copy of this

18

determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within 24 hours of the determination

(3) An alternative method of access to legal materials shall be instituted to permit effective legal research for any prisoner excluded from the law library. A legal coordinator shall visit any excluded prisoner to determine his or her law library needs upon request

(4) Any person affected by a determination made pursuant to this subdivision (j) may appeal such determination to the Board
(i) The person affected by a determination shall give notice in writing to the Board and to the Department of his or her intent to appeal the determination.
(ii) The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination
(iii) The Board or its designee shall issue a written decision upon the appeal within five business days after it has received notice of the requested review.

## SECTION 1-10 VISITING

**(a) Policy**

Prisoners are entitled to receive personal visits of sufficient length and number

**(b) Visiting and Waiting Areas**

(1) By September 1, 1978, a visiting area of sufficient size to meet the requirements of this Part shall be established and maintained in each institution

(2) The visiting area shall be designed so as to allow physical contact between prisoners and their visitors as required by Section 1-10 (f)

(3) The Department shall make every effort to minimize the waiting time prior to a visit Visitors shall not be required to wait outside an institution unless adequate shelter is provided and the requirements of Section 1-10 (b) (4) are met

(4) All waiting and visiting areas shall provide for at least minimal comforts for visitors, including but not limited to:
(i) sufficient seats for all visitors;
(ii) access to bathroom facilities and drinking water throughout the waiting and visiting periods;

19

## DECLARATION OF SERVICE

**DEBORAH A. DORFMAN**, under penalty of perjury, declares pursuant to 28 U.S.C. §1746 that, on January 18, 2008, I caused a true and correct copy of the Defendants' Motion to Dismiss Plaintiff's Amended Complaint, attached thereto, to be served by Messenger and E-mail on Michelle H. Schott, Esq., attorney for plaintiff, at Stroock & Stroock, & Lavan, LLP, 180 Maiden Lane, New York, New York, 10038-4982, the address designated by him for that purpose.

Dated:     New York, New York
           January 18, 2008

By:    _____
       Deborah A. Dorfman
       Assistant Corporation Counsel